Evan J. Smith, Esquire (SBN 242352)
esmith@brodsky-smith.com
Ryan Cardona, Esquire (SBN 302113)
rcardona@brodsky-smith.com
BRODSKY & SMITH, LLC
9595 Wilshire Blvd., Ste. 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile:   (310) 247-0160

*Counsel for Plaintiff Aaron Dominguez*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON DOMINGUEZ, | ) Civil No. |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **COMPLAINT FOR DECLARATORY** |
| | ) **AND INJUNCTIVE RELIEF AND** |
| COMMERCIAL CASTING CO. and | ) **CIVIL PENALTIES** |
| COMMERCIAL MACHINE & | ) |
| ENGINEERING CORPORATION, | ) (Federal Water Pollution Control Act, 33 |
| | ) U.S.C. § 1251 et seq.) |
| Defendant. | ) |
| | ) |
| | ) |

Plaintiff Aaron Dominguez ("Plaintiff"), by and through his counsel, alleges as follows:

1.     This is a citizen suit, brought pursuant to the section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "CWA"), 33 U.S.C. § 1365(a)(1), to address violations of the CWA by defendants Commercial Casting Co. and Commercial Machine & Engineering Corporation ("Commercial" or the "Defendants") arising out of operations at Commercial's facility located at 14933 Whittram Ave., Fontana, California (the "Facility").

2.     Since at least January 3, 2012, Defendants have been discharging and continue to discharge polluted stormwater from the Facility in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342, and in violation of the General Industrial Stormwater Permits issued by the State of California (NPDES General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 92-12-DWQ, as amended by Order No. 97-03-DWQ) ("1997 Permit") and Order No. 2014-0057-DWQ ("2015 Permit") (collectively, the "Industrial Stormwater Permit").

3.     Plaintiff seeks a declaratory judgment, injunctive relief, the imposition of civil penalties, and the award of costs, including attorneys' and expert witness fees, for Defendants' repeated and ongoing violations of the Clean Water Act.

## JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over the parties and subject matter of this action pursuant to section 505(a)(1) of the CWA, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

5.     On January 3, 2017, as required by the CWA, 33 U.S.C. § 1365(b)(1)(A), Plaintiff provided notice of intent to file suit against Defendants for CWA violations ("Notice Letter") to the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board") collectively, "state and federal agencies") and Defendants.

6.     The Notice Letter provided Defendants with sufficient information to determine (i) the CWA requirements Plaintiff alleges Defendants violated, (ii) the activity alleged to constitute the violation(s), (iii) sufficient information to determine the date, location, and person responsible for the violation(s), and (iv) the contact

information for the Plaintiff and Plaintiff's Counsel.  A copy of the Notice Letter is attached as Exhibit 1.

7.    More than sixty (60) days have passed since notice of the alleged violation was served upon Defendants and the state and federal agencies.  Neither the EPA, nor the State of California, has commenced or is diligently prosecuting a court action to redress the violations alleged herein.  No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the CWA, 33 U.S.C. § 1319(g).

8.    Venue is proper in the Central District of California pursuant to section 505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## **PARTIES**

9.    Plaintiff is a citizen of the State of California who, through his recreational activities, uses and enjoys the waters of the San Sevaine Creek, its inflows, outflows, and other waters of the Santa Ana River Watershed, of which the San Sevaine Creek is a part.  Plaintiff's use and enjoyment of these waters is negatively affected by the pollution caused by Defendant's operations.  Plaintiff is dedicated to protecting the water quality of the San Sevaine Creek, and the overall Santa Ana River Watershed for the benefit of its ecosystems and communities.  To further these goals, Plaintiff actively seeks federal and state agency implementation of the CWA, and, where necessary, directly initiates enforcement actions on behalf of himself and for his community.

10.    Plaintiff, like other citizens, taxpayers, property owners, and residents of his community, lives, works, travels near, and recreates in, the San Sevaine Creek, its tributaries, and the overall Santa Ana River Watershed, into which Defendants discharge pollutants.  Plaintiff, like other citizens, taxpayers, property owners, and residents, uses and enjoys the San Sevaine Creek, its tributaries, and the overall Santa Ana River Watershed for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes.  Defendant's discharges of stormwater containing

pollutants impairs each of these uses.  Thus, Plaintiff's interests have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the CWA and the Industrial Stormwater Permit.

11.    Defendant Commercial Casting Co. is an active California company with principal offices located at 14933 Whittram Ave., Fontana, CA 92335.

12.    Defendant Commercial Machine & Engineering Corporation is an active California corporation with principal offices located at 14933 Whittram Ave., Fontana, CA 92335.

13.    Upon Plaintiff's investigation and belief, Defendant Commercial Casting Co. is a subsidiary, trade name, and/or otherwise affiliated with Defendant Commercial Machine & Engineering Corporation.

14.    Defendants own and operate the Facility in question, also located at 14933 Whittram Ave., Fontana, CA 92335.

15.    Defendants' Facility operates as a manufacturer of abrasion, corrosion, and heat-resistant iron and steel castings, as well as gray and ductile irons used for common industrial castings.  Defendant's Facility is located at 14933 Whittram Ave., Fontana, CA 92335.  Activities include (i) mold and core production; (ii) metal charging and melting; (iii) hot metal pouring; (iv) mold cooling; (v) shakeout; (vi) finishing; (vii) grinding; (viii) cutoff operations; (ix) drum storage; and (x) empty drum storage.  Repair and maintenance activities carried out at the Facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.

16.    The Facility is listed as operating under SIC Code 3321, relating to Iron and Steel Foundries.  Defendants applied for coverage under the California Industrial General Permit on August 4, 1997, and was issued WDID No. 8 36I013320. Defendants reapplied for coverage under the 2015 Industrial Stormwater Permit on February 26, 2015, and was granted the continued use of its previously issued WDID

No.  The August 4, 1997, and February 26, 2015 "Notice of Intents" for the Facility to comply with the terms of the Industrial Stormwater Permit list "Commercial Castings Co" as the Operator and Facility names, respectively.  Plaintiff is therefore informed and believes and thereon alleges that Defendants own and/or operate the Facility.

## REGULATORY BACKGROUND

### The Problem of Stormwater Pollution

17.     Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of the San Sevaine Creek, the Santa Ana River, its tributaries, and the overall Santa Ana River Watershed.  With every rainfall event, significant amounts of polluted rainwater flow from local industrial facilities, such as the Facility, and pour into storm drains, local tributaries, and into the San Sevaine Creek, the Santa Ana River, its tributaries, and the overall Santa Ana River Watershed.

18.     Stormwater runoff from industrial sites such as the Facility causes harm to humans and aquatic life.  In particular, stormwater can contain heavy metal pollutants such as aluminum, chromium, copper, iron, lead, mercury, nickel, tin, and zinc, as well as high concentrations of suspended solids, and nitrate plus nitrite nitrogen.  Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects.  Heavy metals have been shown to alter activity in tissues and blood of fish.

19.     High concentrations of total suspended solids ("TSS") degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis.  TSS has been shown to alter predator/prey relationships (for example, turbid water might make it difficult for fish to see their prey).  Deposited solids alter habitat for fish, aquatic plants, and benthic organisms.  TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons ("PAHs"), are absorbed onto TSS.  Thus, higher concentrations of TSS

mean higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

***The Clean Water Act***

20. CWA section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge is in compliance with various enumerated CWA requirements. Among other things, CWA section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to CWA section 402, 33 U.S.C. § 1342.

21. CWA section 402(b), 33 U.S.C. § 1342(b), allows each state to administer its own EPA approved permit program for discharges. In California, the State Board and its nine Regional Boards have approval from EPA to administer an NPDES permit program for the State. The State Board and Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

22. CWA section 402(p), 33 U.S.C. § 1342(p), requires that NPDES permits be issued for stormwater discharges "associated with industrial activity."

23. CWA section 301(b) requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater must achieve technology based effluent limitations by utilizing the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

24. CWA section 505(a)(1) provides for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of

NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. § 1365(a)(1), see 33 U.S.C. § 1362(5).

25.    CWA section 505(a) authorizes a citizen suit action for injunctive relief. 33U.S.C. § 1365(a).

26.    CWA violators are subject to an assessment of civil penalties of up to $37,500 per day per violation for violations occurring after January 12, 2009.  33 U.S.C. § 1319(d), 40 C.F.R. §§ 19.1-19.4.

***State Regulations***

27.    Section 303 of the CWA, 33 U.S.C. § 1313, requires states to adopt Water Quality Standards, including water quality objectives and beneficial uses for navigable waters of the United States.  The CWA prohibits discharges from causing or contributing to a violation of such state Water Quality Standards.  See 33 U.S.C. § 1311(b)(1)(c); 40 C.F.R. §§ 122.4(a), (d); 40 C.F.R. § 122.44(d)(1).

28.    The State of California regulates water quality through the State Board and nine Regional Boards, and each Regional Board maintains a separate Water Quality Control Plan which contains Water Quality Standards for water bodies within its geographic area.

29.    Water Quality Standards ("WQS") applicable to Defendants are set forth in the California Toxic Rule ("CTR")[1] and Chapter 3 of the Santa Ana River Basin Water Quality Control Plan (the "Basin Plan").  Exceedances of WQS constitute violations of the Industrial Stormwater Permit, the CTR, and the Basin Plan.

---

[1] The CTR is set forth at 40 C.F.R. § 131.38 and is explained in the Federal Register preamble accompanying the CTR promulgation set forth at 65 Fed. Reg. 31, 682 (May 18, 2000).

30.     The Basin Plan establishes Beneficial Uses for various areas of the Santa Ana River Basin, into which Stormwater discharges from the facility are likely to flow.[2] Water quality standards are pollutant concentration levels determined by the state or federal agencies to be protective of designated Beneficial Uses.  Discharges above water quality standards contribute to impairment of Receiving Waters' Beneficial Uses. Applicable water quality standards include, among others, the CTR, and water quality objectives in the Basin Plan.  Industrial stormwater discharges must strictly comply with water quality standards, including those criteria listed in the applicable basin plan. *See Defenders of Wildlife v. Browner*, 191 F.3d 1159, 1166-67 (9th Cir. 1999)

31.     The Basin Plan establishes WQS for various areas of the Santa Ana River Basin, including all inland surface waters and the San Sevaine Creek into which stormwater discharges from the facility flow, including the following:

a.     That "[t]he pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5 as a result of controllable water quality factors." *See* Basin Plan, 4-18;

b.     That "[w]aste discharges shall not result in increases in COD levels in inland surface waters which exceed the values shown in Table 4-1 or which adversely affect beneficial uses." *See* Basin Plan, 4-9;

c.     That "Inland surface waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect

---

[2] The Basin Plan identifies the Beneficial Uses of the San Sevaine Creek, which is the most immediate receiving water to the Facility's stormwater runoff, and Santa Ana River Reach 3, Santa Ana River Reach 2, Santa Ana River Reach 1, the Tidal Prism of the Santa Ana River and the Pacific Ocean, into which the Facility's stormwater flows downstream into, as the following: Water Contact Recreation; Non-contact Water Recreation; Agricultural Supply, Municipal and Domestic Supply; Groundwater Recharge; Warm Freshwater Habitat; Wildlife Habitat; Rare, Threatened or Endangered Species; and Spawning, Reproduction and Development. *See* Basin Plan at Table 3-1.

beneficial uses as a result of controllable water quality factors." *See* Basin Plan, 4-19; and

d.      That "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *See* Basin Plan, 4-20.

32.      In addition, the EPA has promulgated WQS for toxic priority pollutants in all California water bodies (the "California Toxics Rule" or "CTR"), which include and apply to the San Sevaine Creek, Santa Ana River, its tributaries, and the overall Santa Ana River Watershed, unless expressly superseded by the Basin Plan.  65 Fed. Reg. 31,682 (May 18, 2000); 40 C.F.R. § 131.38.

***The Industrial Stormwater Permit***

33.      In California, the State Board has elected to issue a single, statewide general permit applicable to all stormwater discharges associated with industrial activity.  On April 17, 1997, the State Board adopted the 1997 Permit, which was in effect through June 30, 2015.  On July 1, 2015, the 2015 Permit became effective and superseded the 1997 Permit, except for enforcement purposes.[3]   To discharge stormwater lawfully in California, industrial dischargers must secure coverage under the Industrial Stormwater Permit and comply with its terms or obtain and comply with an individual NPDES permit.  1997 Permit, p. II; 2015 Permit, Section I(A)(Findings 8, 12).

34.      The Industrial Stormwater Permit is an NPDES permit issued pursuant to CWA section 402(p), 33 U.S.C. § 1342(p).  Violations of the Industrial Stormwater

---

[3] Notably, the 2015 Permit is much more comprehensive than its predecessor, including expanding its purview to "light industry" uses previously exempted, and including more prescriptive requirements for various parts of permit compliance, including BMPs, NALs, SWPPP requirements, Total Daily Maximum Loads for receiving waters, amongst others. *See generally,* 2015 Permit.

Permit are also violations of the CWA.  1997 Permit, Section C(1); 2015 Permit, Section XXI(A).

35.   The Industrial Stormwater Permit contains certain absolute prohibitions. The Industrial Stormwater Permit prohibits the direct or indirect discharge of materials other than stormwater ("non-stormwater discharges"), which are not otherwise authorized by an NPDES permit, to the waters of the United States.  1997 Permit, Order Part A(1); 2015 Permit, Section III(B).  The Industrial Stormwater Permit prohibits stormwater discharges that cause or threaten to cause pollution, contamination, or nuisance (1997 Permit, Order Part A(2); 2015 Permit, Sections III(C), VI(C)) and discharges that adversely impact human health or the environment (1997 Permit, Order Part C(1); 2015 Permit, Section VI(B)).  Finally, the Industrial Stormwater Permit prohibits discharges that cause or contribute to an exceedance of any applicable water quality standard contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.  1997 Permit, Order Part C(2); 2015 Permit, Section VI(A).

36.   On April 1, 2014, the State Board adopted an updated NPDES General Permit for Discharges Associated with Industrial Activity, Water Quality Order No. 2014-57-DWQ, effective as of July 1, 2015.  As of the effective date, Water Quality Order No. 2014-57-DWQ supersedes and rescinds the current Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ, except for purposes of enforcement actions brought pursuant to the Industrial Stormwater Permit, Water Quality Order No. 97-03-DWQ.

37.   Under the CWA and the Industrial Stormwater Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate stormwater pollution.  33 U.S.C. § 1311(b); 1997 Permit, Order Part B(3); 2015 Permit, Section X(H).  The EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs

achieve compliance with the BAT/BCT standards.  Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Industrial Activities ("Multi-Sector Permit"), 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000); Multi Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi Sector Permit, 80 Fed. Reg. 34,403 (June 16, 2015).

38.    The 2015 Permit includes Numeric Action Limits (NALs) that are based on Benchmarks.  2015 Permit, Section I(M) (Finding 62).  Like Benchmarks, the NALs indicate "the overall pollutant control performance at any given facility." *Id.*  Section I(M) (Finding 61).

39.    Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP") at the time industrial activities begin.   1997 Permit, Section A(1)(a) and Order Part E(2); 2015 Permit, Sections I(I) (Finding 54), X(B). The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater discharges from the facility.  1997 Permit, Section A(2); 2015 Permit, Section X(G). The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges.  1997 Permit, Section A(2); 2015 Permit, Section X(H).  The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT.  1997 Permit, Order Part B(3); 2015 Permit, Sections I(D) (Finding 32), V(A).

40.    The SWPPP must include:  a narrative description and summary of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs to be

implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and a description of individuals and their current responsibilities for developing and implementing the SWPPP.  1997 Permit, Section A(1)-(10); 2015 Permit, Section X.

41.     The Industrial Stormwater Permit also requires facility operators to properly operate and maintain any facilities and systems of treatment and control installed or used to achieve compliance with the conditions of the Industrial Stormwater Permit and requirements of the SWPPP at all times.  1997 Permit, Section C(5); 2015 Permit, Section XXI(F).

42.     The SWPPP and site maps must be assessed annually and revised as necessary to ensure accuracy and effectiveness.  1997 Permit, Sections A(1), B(3)-(4); 2015 Permit, Sections I(J) (Finding 55), X(B)(1).

43.     The 1997 Permit required facility operators to develop and implement a monitoring and reporting program ("MRP") when industrial activities begin at a facility.  1997 Permit, Section B(1)-(2) and Order Part E(3).  The MRP must ensure that stormwater discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in the 1997 Permit.  *Id*. at Section B(2).  The MRP must ensure that practices at the facility to prevent or reduce pollutants in stormwater and authorized non-stormwater discharges are evaluated and revised to meet changing conditions at the facility, including revision of the SWPPP. *Id*.

44.     Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the

facility's storm water discharges form the storm event.  1997 Permit, § B(7); 2015 Permit, § XI.A.

45.   The 2015 Permit requires facility operators to monitor and sample stormwater discharges to ensure that the facility is complying with the terms of the permit.  2015 Permit, Sections I(J) (Findings 55-56); XI.

46.   Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  1997 Permit, § B(5)(c)(ii).  Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment." 2015 Permit, § XI(B)(6)(c).

47.   Pursuant to the monitoring and reporting requirements of the Industrial Stormwater Permit, facility operators must conduct ongoing visual observations of stormwater and non-stormwater discharges and record responsive measures taken to eliminate unauthorized non-stormwater discharges and to reduce or prevent pollutants in stormwater and authorized non-stormwater discharges.  1997 Permit, Sections B(3)-(4); 2015 Permit, Section XI(A).  Facility operators must collect samples of stormwater discharges from all locations where stormwater may be discharged from the facility. 1997 Permit, Sections B(5), (7); 2015 Permit, Section XI(B)(4)-(5). As a part of MRP, these collections and analyses must be conducted twice a year; samples must be collected during "the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season." *Id.*  Through the 2014-2015 reporting period, facility operators were required to analyze stormwater samples for pH, total suspended solids, total organic carbon (or oil and grease as a substitute), specific conductance, toxic chemicals, and other pollutants which are likely

to be present in significant quantities in stormwater discharging from the facility.  1997 Permit, Section B(5).

48.     Section XI(B)(2) of the 2015 Permit requires that dischargers collect and analyze storm water samples from two qualifying storm events ("QSEs") during the first half of each reporting year (July 1 to December 31) and two QSEs during the second half of each reporting year (January 1 to June 30).

49.     Under the 1997 Permit, all facilities falling under ten broad industrial categories (including numerous, more specific subcategories) listed in 40 C.F.R. Subchapter N must comply with effluent limitations as proscribed by the E.PA.

50.     In addition to testing required under the listed categories of 40 C.F.R. Subchapter N, the EPA has established the Benchmark values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  *See*, U.S. EPA 2008 Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (the "2008 MSGP").  These Benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  Notably, the Benchmark levels contained in the 2008 MSGP is "consistent" with the BMPs required of facilities under the Industrial Stormwater Permit. 2015 Permit I(D)(33).  The following EPA Benchmarks have been established for pollution parameters applicable to the Facility at issue in this action: (i) Total Aluminum – 0.75 Mg/L; (ii) Total Suspended Solids ("TSS") – 100 Mg/L; (iii) Total Copper –  0.0038-0.0332[4];  (v) Total Iron – 1.0 Mg/L; (vi) Total Zinc – 0.04-0.26[5].

51.     These Benchmarks are reflected in the 2015 Permit in the form of Numeric Action Levels ("NALs").   The 2015 Permit incorporates annual NALs, which are

---

[4] Dependent on the freshwater hardness range of the receiving water.
[5] Dependent on the freshwater hardness range of the receiving water.

derived from a Water Board dataset. The following NALs have been established under the 2015 Permit: (i) Total Aluminum – 0.75 Mg/L; (ii) Total Suspended Solids ("TSS") – 100 Mg/L; (iii) Total Copper – 0.0038-0.0332[6]; (v) Total Iron – 1.0 Mg/L; (vi) Total Zinc – 0.04-0.26[7]. An exceedance of annual NALs occurs when the average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The 2015 Permit also established the following instantaneous maximum NALs: (i) pH – 6.0 – 9.0 s.u.; (ii) TSS – 400 Mg/L; and (iii) O&G – 25 Mg/L. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH. When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

52.    Section B(14) of the 1997 Permit requires dischargers to include laboratory reports with their Annual Reports submitted to the Regional Board. This requirement is continued with the 2015 Permit. 2015 Permit, Fact Sheet, Paragraph O.

53.    Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33

---

[6] Dependent on the freshwater hardness range of the receiving water.
[7] Dependent on the freshwater hardness range of the receiving water.

U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 -19.4.

## STATEMENT OF FACTS

*Facility Background*

54.    Defendants operate the Facility located at 14933 Whittram Ave., Fontana, California.

55.    The Facility is regulated by the Industrial Stormwater Permit.

56.    Defendants submitted a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board in 1997 and in 2015.

57.    Operations at the Facility generally include, but are not limited to (i) mold and core production; (ii) metal charging and melting; (iii) hot metal pouring; (iv) mold cooling; (v) shakeout; (vi) finishing; (vii) grinding; (viii) cutoff operations; (ix) drum storage; and (x) empty drum storage.  Other activities carried out in the regular course of business at the Facility include: storage of fuel and other oils, maintenance, equipment storage, and waste storage.  Repair and maintenance activities carried out at the facility include, but are not limited to, electrical, plumbing, roofing, asphalt, concrete, and utilities repairs as well as janitorial duties.  The Facility also maintains material storage areas, and waste storage areas.

58.    Some operations at the Facility occur outdoors and are causing pollutants to be exposed to rainfall.

59.    Vehicles and equipment at the Facility expose many other sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids, and hydraulic fluids.

60.    The types of pollutants that the Facility releases into the immediate environment are known to include, or have the potential to include, among other contaminants; total suspended solids ("TSS"), waste oils, lubricants, fuel, trash, debris,

hazardous materials, oil and grease, pH, heavy metals, such as, aluminum, copper, iron, zinc, and other pollutants.

61.     The industrial materials stored and the pollutants generated at the Facility are exposed to stormwater flows.

62.     Activities at the Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Facility.  During rain events, this pollution washes off of those surfaces and into the San Sevaine Creek, Santa Ana River, and the overall Santa Ana River Watershed.  Stormwater from the Facility discharges into the San Sevaine Creek, Santa Ana River and the overall Santa Ana River Watershed.

***Activities Contributing to CWA Violations***

63.     Defendants have not developed and/or implemented an adequate SWPPP at the Facility.

64.     Defendants have not developed and/or implemented BMPs that adequately minimize the exposure of pollutants to stormwater at the Facility.

65.     Defendants have not developed and/or implemented BMPs at the Facility that adequately control and minimize polluted runoff from the Facility.

66.     Defendants have not developed and/or implemented BMPs at the Facility that adequately treat and remove pollutants in stormwater prior to discharge.

67.     Defendants have not developed and/or implemented adequate measures to reduce or eliminate stormwater pollution that constitute BAT/BCT.

68.     Defendants have not developed and/or implemented adequate BMPs at the Facility to achieve stormwater discharges that meet EPA Benchmarks or applicable Water Quality Standards.

69.     Defendants have not adequately evaluated and revised the Facility's SWPPP to address these failures.  Defendants have also failed to properly operate and

maintain the structures and systems that have been put in place at the Facility to achieve compliance with the Industrial Stormwater Permit and its SWPPP requirements.

70.  Defendants have not developed and/or implemented an adequate MRP at the Facility.

71.  Defendants' monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facility.

72.  Defendant's monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revisions of the SWPPP.

73.  Due to Defendants' lack of effective pollution prevention measures, including effective BMPs, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents.  The potential pollutants from the Facility include total suspended solids ("TSS"), waste oils, lubricants, fuel, trash, debris, hazardous materials, oil and grease, pH, heavy metals, such as aluminum, copper, iron, zinc, and other pollutants. Stormwater from the Facility discharges, via the local storm sewer system and/or surface runoff, directly into the San Sevaine Creek, Santa Ana River, and the overall Santa Ana River Watershed.

74.  Polluted stormwater is discharged from the Facility into San Sevaine Creek, Santa Ana River, and the overall Santa Ana River Watershed.  The San Sevaine Creek, Santa Ana River, its tributaries, and the overall Santa Ana River Watershed are waters of the United States.

75.  Defendants' submitted annual reports for the last five years show a complete failure to conduct consistent stormwater sampling or testing as required by the Industrial Stormwater Permit, as well as a failure to meet benchmark/NAL requirements imposed by the Industrial Stormwater Permit.  Defendants have reported NAL exceedances for Copper, Zinc, Iron, and/or TSS in the 2013-2014 and 2011-2012

annual reporting periods, and the Facility has thus discharged stormwater contaminated with higher levels of pollutants than are permissible under the Industrial Stormwater Permit.

76.     Additionally, as stated in the Industrial Stormwater Permit, facilities are required to provide testing data, for all requisite NALs, for four Qualifying Storm Events per year.  Notably, Defendants have impermissibly failed to provide sufficient testing data, including failing to submit any attached laboratory reports, for the 2015-2016, 2014-2015, and 2012-2013 annual reporting periods.  Additionally, while still before the deadline of the current 2016-2017 annual reporting period, Defendants have yet to upload any testing data whatsoever for the current period to the Santa Ana Regional Water Quality Control Board's online public document filing system, despite record rainfall for the past several months in the region.

77.     Due to these numerous insufficiencies, discrepancies, and failures contained in the Defendants' annual stormwater sampling (or lack thereof), the Facility's discharges of stormwater contain are likely to be regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT. [8]

## FIRST CAUSE OF ACTION

### Discharges in Violation of Permit Prohibitions of the Industrial Stormwater Permit
### (Violations of 33 U.S.C. §§ 1311, 1342)

78.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

79.     The Industrial Stormwater Permit requires that stormwater discharges and authorized non-storm water discharges shall not cause or threaten to cause pollution,

---

[8] Defendants' benchmark/NAL exceedances and impermissible failures to consistently test for NAL levels, and failures to report NAL testing, for the 2015-2016, 2014-2015, 2013-2014, 2012-2013, and 2011-2012 annual reporting periods are described in more detail in the Notice, which is attached to this Complaint as Exhibit 1.

contamination, or nuisance; and shall not cause or contribute to a violation of any water quality standards contained in a statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan (collectively, "Prohibitions").

80.    Since at least January 3, 2012, Defendants have been discharging polluted stormwater from the Facility in violation of the Prohibitions of the Industrial Stormwater Permit during every significant rain event (defined by EPA as a rainfall event generating 0.2 inches or more of rain).  *See* Exhibit 1, Notice Letter at Attachment 3.

81.    The polluted stormwater discharged from the Facility during every significant rain event contains pollutants harmful to fish, plants, birds, and human health that have adversely affected, and continue to adversely affect, human health and the environment in violation of the Industrial Stormwater Permit.

82.    Discharges of polluted stormwater from the Facility have in the past caused, and will continue to cause, pollution, contamination, and/or nuisance to the waters of the United States in violation of the Industrial Stormwater Permit and the Water Quality Standards set forth in the Basin Plan.

83.    Each day since at least January 3, 2012 that Defendants have discharged polluted stormwater from the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

84.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

85.    An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff, for which harm he has no plain, speedy, or adequate remedy at law.

86.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION

### Discharge in Violation of Effluent Limitations of the Industrial Stormwater Permit
### (Violations of 33 U.S.C. §§ 1311, 1342)

87.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

88.     The Industrial Stormwater Permit's SWPPP requirements and effluent limitations require dischargers to reduce or prevent pollutants in their stormwater discharges through the implementation of measures that must achieve BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

89.     Defendants have discharged and continue to discharge stormwater from the Facility containing levels of pollutants that do not achieve compliance with the BAT/BCT requirements during every significant rain event occurring from January 3, 2012, through the present.  Defendants' failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Industrial Stormwater Permit and the CWA.  *See* 1997 Permit, Order Part B(3); 2015 Permit, Sections I(D) (Finding 32), V(A); 33 U.S.C. § 1311(b).

90.     Each day since at least January 3, 2012, that Defendants have discharged stormwater containing pollutants in violation of the Industrial Stormwater Permit, specifically Effluent Limitation B(3) of the 1997 Permit, is a separate and distinct violation of section 301(a) of the CWA, 33 U.S.C. § 1311(a).

91.     Defendants' CWA violations described in the paragraphs above will continue in the future until Defendant' develop and implement BMPs at the Facility adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

92.     By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

93.     An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm he has no plain, speedy, or adequate remedy at law.

94.     An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## THIRD CAUSE OF ACTION

**Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan, In Violation of the Industrial Stormwater Permit (Violations of 33 U.S.C. § 1311, 1342)**

95.     Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

96.     The Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement an adequate SWPPP when they commence industrial activity.  1997 Permit, Section A(1); 2015 Permit, Section X(B).

97.     Defendants, as of August 4, 1997, have commenced industrial activity and continues to conduct industrial activity at the Facility.

98.     Defendants have failed and continue to fail to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by the Industrial Stormwater Permit.

99.     Defendants have failed and continue to fail to develop or implement a SWPPP for the Facility that includes BMPs adequate to meet the requirements of the

Industrial Stormwater Permit, specifically Section A of the 1997 Permit and Section X of the 2015 Permit.

100.   Defendants have failed and continue to fail to adequately develop or implement a SWPPP at the Facility that prevents discharges from violating the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations of the Industrial Stormwater Permit.

101.   Each day since January 3, 2012, that Defendants have failed to adequately develop and/or implement a SWPPP for the Facility in violation of the Industrial Stormwater Permit is a separate and distinct violation of CWA section 301(a), 33 U.S.C. § 1311(a).

102.   Defendants have been in violation of the Industrial Stormwater Permit's SWPPP requirements every day since January 3, 2012.  Defendants will continue to be in violation of the SWPPP requirements each day that Defendants fails to develop and fully implement an adequate SWPPP for the Facility.

103.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to CWA sections 309(d) and 505, 33 U.S.C. §§ 1319(d) and 1365.

104.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm he has no plain, speedy, or adequate remedy at law.

105.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

**FOURTH CAUSE OF ACTION**

**Failure to Develop and Implement an Adequate Monitoring and Reporting Program, In Violation of the Industrial Stormwater Permit**
**(Violations of 33 U.S.C. §§ 1311)**

106.   Plaintiff incorporates the allegations contained in all other paragraphs as though fully set forth herein.

107.   Defendants have discharged and continue to discharge pollutants from the Facility in violation of the Industrial Stormwater Permit.   Defendants are also in violation of the Industrial Stormwater Permit for repeated failure to report proper annual stormwater discharge data as required by the Industrial Stormwater Permit. Thus, Defendants' discharges constitute an unpermitted discharge of pollutants from the Facility to waters of the United States in violation of CWA section 301(a), 33 U.S.C. § 1311(a).

108.   Defendants have been in violation of CWA section 301(a) every day they have discharged stormwater from the Facility to waters of the United States since January 3, 2012.  Defendants will continue to be in violation of the CWA each day that unpermitted stormwater discharges from the Facility to waters of the United States.

109.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties pursuant to sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d) and 1365.

110.   An action for injunctive relief is authorized by CWA section 505(a), 33 U.S.C. § 1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff for which harm he has no plain, speedy, or adequate remedy at law.

111.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

### **RELIEF REQUESTED**

Plaintiff respectfully requests this Court to grant the following relief:

A.    Declare Defendants to have violated and to be in violation of sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements, and for failing to comply with the substantive and procedural requirements of the Industrial Stormwater Permit;

B.    Enjoin Defendants from discharging pollutants from the Facility to stormwater discharge points, which discharge to the San Sevaine Creek, Santa Ana River, and the overall Santa Ana River Watershed;

C.    Order Defendants to restore all receiving waters damaged by Defendants' illegal discharges of pollutants from the Facility;

D.    Enjoin Defendants from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

E.    Order Defendants to pay civil penalties of up to $37,500 per day for all violations occurring after August 22, 2011 in accordance with CWA section 309(d), 33 U.S.C. § 1319(d) and 40 C.F.R. §§ 19.1-19.4;

F.    Award Plaintiff his costs (including reasonable attorney, witness, and consultant fees) as authorized by the CWA section 505(d), 33 U.S.C. § 1365(d);

G.    Award such other relief as this Court may deem appropriate.

Dated: March 31, 2017

BRODSKY & SMITH, LLC

By:_____
Evan J. Smith, Esquire (SBN242352)
esmith@brodsky-smith.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ryan Cardona, Esquire (SBN302113)
rcardona@brodsky-smith.com
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:   (877) 534-2590
Facsimile:    (310) 247-0160

*Attorneys for Plaintiff*

COMPLAINT